UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| MARGARET SIUDUT, | ) | |
|---|---|---|
| Plaintiff/Counter-Defendant, | ) | 12 C 1726 |
| vs. | ) | Judge Feinerman |
| BANNER LIFE INSURANCE COMPANY, | ) | |
| Defendant/Counter-Plaintiff. | ) | |

### MEMORANDUM OPINION AND ORDER

Margaret Siudut brought this suit in the Circuit Court of Cook County, Illinois, alleging that Banner Life Insurance Company's refusal to pay on the life insurance policy held by her deceased husband, Paul Siudut ("Paul"), breached the policy and constituted a vexatious and unreasonable delay under 215 ILCS 5/155. Doc. 1-2. Banner removed the case to this court. Doc. 1. Alleging that Paul's policy application had misrepresented his medical history, Banner counterclaimed for rescission of the policy under 215 ILCS 5/154 and a declaration that the policy is null and void. Doc. 10 at pp. 11-17. Siudut and Banner have cross-moved for summary judgment on the claims and counterclaims. Docs. 23, 32. Siudut's motion is denied, and Banner's motion is granted in part and denied in part.

### Background

Before setting forth the relevant background, the court addresses three motions that bear on the composition of the summary judgment record. First, Banner moves to strike portions of Siudut's Local Rule 56.1(a)(3) statement, portions of Siudut's Local Rule 56.1(b)(3)(B) response to Banner's Local Rule 56.1(b)(3)(B) statement, and portions of Siudut's summary judgment

1

briefs, and to deem admitted portions of Banner's Local Rule 56.1(a)(3) statement. Doc. 42. Banner argues that Siudut should not be permitted to deny the assertions in its Local Rule 56.1(a)(3) statement that rested on allegations of its counterclaims because Siudut admitted those allegations by failing to answer the counterclaims; Banner also contends that Siudut has failed to support some of her denials with citations to the record or other materials, in violation of Local Rule 56.1(b)(3)(B). Siudut has responded to Banner's motion with two motions of her own: a motion for leave to file an answer to Banner's counterclaims, and a motion for leave to file an amended Local Rule 56.1(b)(3)(B) response. Docs. 48, 49. Banner's motion is denied, and Siudut's motions are granted.

The purpose of Local Rule 56.1 "is to make the summary judgment process less burdensome on district courts, by requiring the parties to nail down the relevant facts and the way they propose to support them." *Sojka v. Bovis Lend Lease, Inc.*, 686 F.3d 394, 398 (7th Cir. 2012). "These rules were not intended to provide a maze of technical traps to complicate and delay litigation without advancing the merits." *Stevo v. Frasor*, 662 F.3d 880, 887 (7th Cir. 2011). Although district courts "are entitled to insist on strict compliance with local rules designed to promote the clarity of summary judgment filings," the Seventh Circuit has "not endorsed the very different proposition that litigants are entitled to expect strict enforcement by district judges." *Ibid*. "Rather, it is clear that the decision whether to apply the rule strictly or to overlook any transgression is one left to the district court's discretion." *Ibid*. (internal quotation marks omitted); *see also Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995).

It is appropriate under the particular circumstances of this case to overlook Siudut's transgressions. The central issue to Siudut's claims and Banner's counterclaims is whether Paul

2

properly or improperly answered "No" when asked on the life insurance policy application whether he had received any treatment for, or had been advised to have treatment for or to refrain from, alcohol use. The answer to that question rests primarily on the records and recollection of Paul's physician, Dr. Zdenek Durek, regarding what he advised Paul about alcohol-related medical issues at medical appointments in September and October 2007. All this state of play was readily apparent when the summary judgment motions were filed. Accordingly, although Siudut's original Local Rule 56.1(b)(3)(B) response (Doc. 34) failed to comply with the requirement that she support her denials with citations to the record or other materials, it is obvious, and undoubtedly was obvious to Banner, that Siudut's denials were in fact based on certain favorable (to Siudut) portions of Dr. Durek's deposition transcript and records. Siudut's proposed amended Local Rule 56.1(b)(3)(B) response (Doc. 48-1) does not assert any new facts or denials; rather, it simply provides specific citations to the transcript and records. Given these circumstances, Banner would suffer no unfair prejudice if Siudut were permitted to file her amended Local Rule 56.1(b)(3)(B) response and if the court considered the record citations offered in support of Siudut's denials.

Similarly, although Siudut's failure to answer Banner's counterclaims is hardly a model of good litigation practice, Banner would not be unfairly prejudiced if Siudut were allowed to file her proposed answer (Doc. 49-1) at this time. Banner's counterclaims mirror Siudut's complaint, both factually and legally. Banner's contention that it "will be prejudiced because it cannot address the content of the Answer in its briefs in support of its Motion for Summary Judgment," Doc. 58 at 3, cannot be taken seriously. Banner knew full well Siudut's position on all substantive issues in this case from her complaint and from discovery. Banner does not

3

identify any additional discovery it would have sought had Siudut's proposed answer been filed before Banner moved for summary judgment. As a result, Siudut's motion for leave to file an answer to Banner's counterclaims is granted.

When considering whether Banner is entitled to summary judgment, the facts will be considered in the light moved favorable to Siudut, and when considering whether Siudut is entitled to summary judgment, the facts will be considered in the light most favorable to Banner. *See In re United Air Lines, Inc.*, 453 F.3d 463, 468 (7th Cir. 2006) ("With cross summary judgment motions, we construe all facts and inferences therefrom in favor of the party against whom the motion under consideration is made.") (internal quotation marks omitted). That said, the following facts are undisputed, either by the parties' agreement or because they simply quote from a document in the record or recite what a deponent said during a deposition.

### A. Paul's Application and the Insurance Policy

Banner issued a $450,000 life insurance policy on Paul's life, effective February 10, 2009. Doc. 48-1 at ¶ 5; Doc. 10-1 at 2-10. Banner issued the Policy pursuant to Paul's application for insurance. Doc. 48-1 at ¶ 6; Doc. 10-1 at 14-21. Paul signed and dated Parts I and II of the Application on October 24, 2008. Doc. 48-1 at ¶¶ 7-8; Doc. 10-1 at 16-17, 19. Siudut's answers to the questions on the Application were recorded by a nurse. Doc. 41 at ¶ 40.

Part I of the Application states in part:

> **IN CONNECTION WITH THIS APPLICATION FOR INSURANCE, IT IS UNDERSTOOD AND AGREED THAT:**
>
> *The statements contained here and in Part II of this application* and any supplement thereto, copies of which shall be attached to and made a part of any policy to be issued, *are true to the best of my (our) knowledge and belief* and are made to induce the Company to issue an insurance policy. I agree to notify the Company of any changes to the statements and answers given in

4

any part of the application before accepting delivery of any policy….

**Except as may be provided in a duly issued Conditional Receipt, no insurance shall take effect unless and until the policy has been physically delivered and the first full premium paid during the lifetime of the insured(s) and then only if the person(s) to be insured is (are) actually in the state of health and insurability represented in Parts I and II of this application and any supplements thereto, copies of which shall be attached and made part of the policy to be issued.**

Doc. 48-1 at ¶ 9 (italics added); Doc. 10-1 at 16. Paul answered "No" to Question 4(a) in Part II, which asked: "Within the past 10 years, have you: a. Had any treatment for, or been advised to have treatment for or to refrain from, the use of alcohol or any drug?" Doc. 48-1 at ¶ 10; Doc. 10-1 at 18. For Questions 3-7 in Part II, the Application asked Paul to provide "full details for each question answered YES, including date[,] nature of illness or injury … treatment, … name, address and telephone number of doctors, hospitals or clinics involved." Doc. 48-1 at ¶ 11; Doc. 10-1 at 19. The Application did not ask anything about the frequency of the applicant's alcohol consumption. Doc. 41 at ¶ 41.

On March 2, 2009, Paul signed a "Supplement to the Application" on which an "X" was marked in the box in Part A next to "No Change in Health for Paul Siudut." Doc. 48-1 at ¶ 12; Doc. 10-1 at 23. The Supplement provided in pertinent part: "Part A is to be completed if there has been no change in health of any of the proposed insured(s)" and "I represent that, to the best of my knowledge and belief, these statements are complete and true and agree that this statement and the answers given herewith will be made part of the new contract, if issued…." Doc. 48-1 at ¶ 13; Doc. 10-1 at 23. On March 2, 2009, Paul signed a Policy Delivery Receipt and Health Statement stating that he had no change in health since "the date of the last medical examination or non-medical application for insurance with Banner Life Insurance Company." Doc. 48-1 at

5

¶ 14; Doc. 10-2 at 2. The Delivery Receipt provided in pertinent part: "By signing below, I certify that … the proposed insured's health and medical history remain in every aspect as described in the application." Doc. 48-1 at ¶ 15; Doc. 10-2 at 2.

Paul's completed Application and Delivery Receipt were submitted to Banner. Doc. 48-1 at ¶ 16. Based in part on the representations that Paul made in the Application and Delivery Receipt, Banner issued the Policy. *Id*. at ¶ 17. As part of its underwriting process, Banner employs written underwriting guidelines that, along with the judgment of the underwriter, determine whether Banner can provide coverage to the applicant. *Id*. at ¶ 29. Banner relies on the information provided in a proposed insured's application to determine whether that applicant is insurable under Banner's underwriting guidelines. *Id*. at ¶ 30. According to Sharon Jenkins, Banner's Chief Underwriter, "Banner Life would not have issued coverage to Siudut if it had known his true health history. Specifically, upon review of the medical records, Banner Life determined that Siudut's diagnosis of alcohol abuse, Dr. Durek's medical advice to stop drinking alcohol and referral of Siudut to another physician for consultation regarding and treatment of his alcohol abuse, all in September 2007, by themselves would have resulted in the rejection of the Application." Doc. 30-3 at ¶¶ 22-23. Siudut denies Jenkins's statement that Banner would have not issued coverage had it known about Dr. Durek's treatment of Paul. Doc. 48-1 at ¶ 31.

Banner received notice on or about February 7, 2011, that Paul had died on February 5, 2011, and Siudut submitted a claim for life insurance benefits under the Policy on or about February 18, 2011. *Id*. at ¶ 18. On or about June 30, 2011, Banner denied Siudut's claim and sent her a check for a full refund of all premium payments made on the Policy. *Id*. at ¶ 25. Siudut did not cash the check. *Id*. at ¶ 26.

**B.     Paul's Medical History**

In connection with its routine investigation of Siudut's claim, Banner obtained Paul's medical records, including records from Dr. Durek. *Id.* at ¶ 19. Dr. Durek testified at his deposition that the only independent recollection he had of Paul was that he "was an unusually heavy-set man" and "sort of pleasant." Doc. 26-6 at 17. According to Dr. Durek, at an appointment on September 6, 2007, Paul reported drinking three to four beers or two to three glasses of wine per day. *Id.* at 23, 27; Doc. 48-1 at ¶ 20. Among the coded diagnoses/symptoms set forth in the medical records, Dr. Durek included "alcohol abuse." Doc. 26-6 at 24, 27. Dr. Durek also wrote "hold alcohol + wine" in his records. Doc. 48-1 at ¶ 21. At his deposition, Dr. Durek testified regarding that notation as follows:

> Q: So under management plan/orders, it reads here, hold alcohol plus wine, correct?
>
> A: Yes.
>
> Q: And what does that mean? Why did you write that?
>
> A: Well, because he admitted to drinking, so I initially advised him to hold alcohol and wine.
>
> Q: Okay. And so you told him to hold alcohol plus wine, correct?
>
> A: Yes.
>
> Q: And when you told him to hold alcohol and wine, what did you mean?
>
> A: Well, reduction of consumption of alcohol.
>
> Q: So did you tell him to stop drinking alcohol and wine altogether?
>
> A: Yes.
>
> Q: Okay. So you told him to stop drinking alcohol?

> A: Yes.

Doc. 26-6 at 28-29. Later in the deposition, Dr. Durek testified:

> Q: I believe that you testified that hold alcohol and wine meant that you wanted him to reduce his alcohol intake and you also testified that you wanted him to stop completely?
>
> A: Stop, yes. Always I suggested because some interpret—would interpret it if you say reduce that you could continue drinking, you know. So I tell the patient to stop drinking.

*Id.* at 90-91. Dr. Durek then testified:

> Q: On September 6, 2007, Paul Siudut told you that he drank alcohol, beer and wine daily, three to four beers or two to three glasses of wine per day, correct?
>
> A: That's what my note says.
>
> Q: And based on what he told you, you diagnosed him with alcohol abuse, correct?
>
> A: Yes.
>
> Q: And you told him to hold alcohol and wine meaning that he was to stop drinking alcohol and wine, correct?
>
> A: Yes.

*Id.* at 91.

Dr. Durek saw Paul again on September 10, 2007. At that time, Dr. Durek referred Paul to an addiction specialist for the purpose of determining whether Paul suffered from alcohol abuse. *Id.* at 34-36. Dr. Durek also testified that as of September 10, 2007, he continued to diagnose Paul with alcohol abuse. *Id.* at 33-34. At his deposition, when asked, "did you tell Mr. Siudut that you were diagnosing him with alcohol abuse?", Dr. Durek replied, "I must have because later I sent him for addiction counseling to Hinsdale Hospital to Dr. Reedy." *Id.* at 28.

Dr. Durek's notes from his September 10, 2007 meeting with Paul indicate: "Alcohol abuse consult Dr. Reedy, Hinsdale Hospital." *Id*. at 32. With respect to the referral to Dr. Reedy, Dr. Durek testified as follows:

> Q: So you wrote here alcohol abuse consult, Dr. Reedy. So why did you write that? What did you want Mr. Siudut to do?
>
> A: I wanted him to—Mr. Siudut or Dr. Reedy?
>
> Q: What did you want Mr. Siudut to do?
>
> A: To make appointment with him and to be treated by him for alcohol abuse. It's a consult. They usually evaluate in detail and arrange for treatments. So do whatever is necessary, detoxification, or other things.
>
> Q: Okay. And so was your intent for—was your instruction to Mr. Siudut to go make an appointment with Dr. Reedy so that ultimately he could receive treatment for his alcohol abuse?
>
> A: Yes. Plus I wanted to know the extent of his alcoholic problems.
>
> Q: Okay. And so just to be clear, you told—during this meeting on September 10, you instructed Mr. Siudut to make an appointment with Dr. Reedy?
>
> A: Yes.

*Id*. at 35-36. Dr. Durek also testified:

> Q: You said that you in answer to counsel's question about your referring Paul Siudut to Dr. Reedy, you said that you wanted to know Dr. Reedy's suggestions, correct?
>
> A: Yes, his opinion, his consultation.
>
> Q: And so you're describing it as a consultation?
>
> A: Yes.
>
> Q: So if Dr. Reedy determined that Paul Siudut did not, in fact, abuse alcohol, you would defer to him, is that correct?
>
> A: Yes.

9

*Id*. at 93.  Similarly, Dr. Durek testified that he referred Paul to Dr. Reedy "for a determination as to whether or not he was, in fact, abusing alcohol."  *Id*. at 74.  Dr. Durek later testified that he was not certain of his diagnosis of alcohol abuse for Paul, and that he "cannot answer the question if [Paul] has chronic alcoholism."  *Id*. at 84-85.  Dr. Durek added that he was "waiting for Dr. Reedy's consultation" before confirming the diagnosis of alcohol abuse.  *Id*. at 83.

Dr. Durek's notes from his September 17, 2007 appointment with Paul indicate that Paul reported "reducing alcohol intake considerably."  *Id*. at 38-39.  Dr. Durek also testified that Paul said that he had not seen Dr. Reedy.  *Id*. at 39-40.  As of September 17, 2007, Dr. Durek continued to diagnose Paul with alcohol abuse, although he did not write the diagnosis in his notes.  *Id*. at 40.  Dr. Durek last treated Paul on October 1, 2007.  *Id*. at 44.  Dr. Durek did not refer Paul to Alcoholics Anonymous or any other alcohol or substance abuse group.  Doc. 41 at ¶ 50.  Dr. Durek did not refer Paul to inpatient treatment for alcohol abuse.  *Id*. at ¶ 51.

Dr. Iulia Enacopol saw Paul on seven times between April 2006 and September 2006.  *Id*. at ¶ 62.  Dr. Enacopol never diagnosed Paul with alcohol abuse.  *Id*. at ¶ 63.  None of the labs ordered by Dr. Enacopol indicate that Paul was abusing alcohol.  *Id*. at ¶ 64.  In Dr. Enacopol's opinion, Paul did not abuse alcohol.  *Id*. at ¶ 66.

Dr. Vlad Badescu saw Paul nine times between December 2007 and February 2011.  *Id*. at ¶ 70.  Dr. Badescu never diagnosed Paul with alcoholism, a drinking problem, or "as having abused or been abusing alcohol."  *Id*. at ¶¶ 72-74.  In Dr. Badescu's opinion, Paul was "absolutely not" an alcoholic or an alcohol abuser.  *Id*. at ¶¶ 76-77.

## Discussion

### I. Siudut's Claims

#### A. Breach of Policy Claim

Under Illinois law, a plaintiff alleging breach of contract must show: "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages." *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010) (quoting *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 814 N.E.2d 960, 967 (Ill. App. 2004)). Banner and Siudut disagree as to whether Paul substantially performed his obligation under the Application and Policy to answer truthfully and completely the Application's Question 4(a).

"Under Illinois law, a misrepresentation for insurance is not by itself grounds for denial of coverage." *Methodist Med. Ctr. of Ill. v. Am. Med. Sec., Inc.*, 38 F.3d 316, 319 (7th Cir. 1994) (footnote omitted); *see also Rivera v. Benefit Trust Life Ins. Co.*, 921 F.2d 692, 695 (7th Cir. 1991). Section 154 of the Illinois Insurance Code provides that "[n]o … misrepresentation or false warranty shall defeat or avoid the policy unless it shall have been made with actual intent to deceive or materially affects either the acceptance of the risk or the hazard assumed by the company." 215 ILCS 5/154. "The statute establishes a two-prong test to be used in situations where insurance policies may be voided: [1] the statement must be false and [2] the false statement must have been [a] made with an intent to deceive or [b] must materially affect the acceptance of the risk or hazard assumed by the insurer." *Golden Rule Ins. Co. v. Schwartz*, 786 N.E.2d 1010, 1015 (Ill. 2003). "Under the statute, therefore, a misrepresentation, even if innocently made, can serve as the basis to void a policy." *Ibid*.

11

This relatively strict statutory scheme, under which certain misrepresentations by a policyholder in his application will result in coverage being voided even if the misrepresentation is innocent, does not apply where the application requires the applicant to answer questions to the best of his "knowledge and belief." *See id*. at 1016 ("the addition of the 'knowledge and belief' language to an application establishes a lesser standard of accuracy than that imposed under statutes akin to section 154"). The Illinois Supreme Court has held that this "knowledge and belief" language has "the effect of shifting the focus, in a determination of the truth or falsity of an applicant's statement, from the inquiry into whether the facts asserted were true to whether, on the basis of what he knew, the applicant *believed* them to be true." *Ibid*. (emphasis added); *see also Med. Protective Co. v. Kim*, 507 F.3d 1076, 1085-86 (7th Cir. 2007); *Pekin Ins. Co. v. Adams*, 796 N.E.2d 175, 179 (Ill. App. 2003) ("[i]n light of *Golden Rule*, the inquiry is not simply whether the answer to question No. 9 of Amanda's application for insurance was false but whether she actually knew and believed it was false"). That said, "knowledge [must] not defy belief." *Golden Rule*, 786 N.E.2d at 1017 (internal quotation marks omitted). "What the applicant in fact believed to be true is the determining factor in judging the truth or falsity of his answer, but only so far as that belief is not clearly contradicted by the factual knowledge on which it is based. In such event, a court may properly find a statement false as a matter of law, however sincerely it may be believed." *Ibid*. (internal quotation marks omitted).

Paul's application includes this "knowledge and belief" language. Doc. 10-1 at 16 ("[t]he statements contained here and in Part II of this application and any supplement thereto, copies of which shall be attached to and made a part of any policy to be issued, are true to the best of my (our) knowledge and belief"). Accordingly, "the response given [by Paul] to question [4(a)]

12

must be assessed in light of [Paul's] actual knowledge and belief." *Golden Rule*, 786 N.E.2d at 1016-17. Question 4(a) asked: "Within the past 10 years, have you: a. Had any treatment for, or been advised to have treatment for or to refrain from, the use of alcohol or any drug?" Doc. 48-1 at ¶ 10. Banner argues that Dr. Durek's deposition testimony and records indisputably establish that Paul misrepresented his medical history in light of his actual knowledge and belief, while Siudut argues that the same evidence indisputably establishes that Paul's answer accurately reflected his actual knowledge and belief.

The record does not indisputably resolve this question in either party's favor. It is unclear from Dr. Durek's deposition whether he affirmatively diagnosed Paul with alcohol abuse or, rather, whether he merely referred Paul to Dr. Reedy for consultation with the expectation that Dr. Reedy would make that diagnosis. Even if Dr. Durek can be understood to have testified that he diagnosed Paul with alcohol abuse, the record does not reveal whether Dr. Durek informed Paul of the diagnosis or, again, simply referred Paul to Dr. Reedy.

Banner relies heavily on the "hold alcohol + wine" notation in Paul's file, arguing that it definitively proves that Dr. Durek told Paul to "refrain" from using alcohol. But again, Dr. Durek's deposition testimony is ambiguous. At first, when asked what he meant by "hold alcohol + wine," Dr. Durek testified that he "initially advised [Paul] to hold alcohol and wine." Doc. 26-6 at 28. When asked what he meant by that, Dr. Durek answered, "Well, reduction of consumption of alcohol." *Id*. at 29 (emphasis added). Later, following leading questions from Banner's counsel, Dr. Durek testified that he told Paul to stop drinking alcohol completely. *Id*. at 29, 90-91. Dr. Durek can be forgiven his conflicting answers, as he was deposed five years after he last treated Paul and had little independent recollection of their appointments.

13

The ambiguities in the record regarding what Dr. Durek advised Paul, particularly when considered along with the opinions of Paul's other doctors that he did not suffer from alcohol abuse, creates genuine dispute as to the content of Paul's "actual knowledge and belief" at the time he stated on the Application that he had not had any treatment for, and had not been advised to have treatment for or to refrain from, the use of alcohol. The Seventh Circuit has made clear that "district courts presiding over summary judgment proceedings may not weigh conflicting evidence, or make credibility determinations, both of which are the province of the jury." *Omnicare, Inc. v. UnitedHealth Group, Inc.*, 629 F.3d 697, 704-05 (7th Cir. 2011) (internal quotation marks and citations omitted). Accordingly, on this record, the content of Paul's actual knowledge and belief, and thus whether Paul reasonably believed his answer to Question 4(a) to be true, must be resolved by a jury at trial. *See Med. Protective*, 507 F.3d at 1086 ("[t]he jury was entitled to sift and weigh" evidence related to an alleged misrepresentation on an insurance policy application); *Golden Rule*, 786 N.E.2d at 1017 ("Based upon the facts of the case now before us, we find that [the misrepresentation] assessment involves a credibility determination that may only be made by the jury."). And because that question must be left for trial, Banner's summary judgment motion on Siudut's contract claim is denied.

Notwithstanding the genuine dispute over Paul's actual knowledge and belief, Siudut might still be entitled to summary judgment if the record indisputably demonstrated that his misrepresentation (assuming there was a misrepresentation within the meaning of *Golden Rule*) was not material to Banner's coverage decision. *See Methodist Med. Ctr.*, 38 F.3d at 319; *Golden Rule*, 786 N.E.2d at 1017 ("If a jury determines that the answer to Question 9 was not made to the best of the applicant's knowledge and belief, the jury must then determine whether

14

the misstatement was material to the insurer's acceptance of the risk and whether the insurer would have issued the policy had it known the true facts."). But given the record evidence, particularly Sharon Jenkins's declaration that Banner would not have issued the Policy had it been aware of Dr. Durek's medical records, the court cannot conclude that the misrepresentation was immaterial. *See Conti v. Health Care Serv. Corp.*, 882 N.E.2d 614, 621 (Ill. App. 2007) ("[A]n insurer's employee or underwriter may testify to establish the materiality of a misrepresentation."); *Small v. Prudential Life Ins. Co.*, 617 N.E.2d 80, 83 (Ill. App. 1993) ("Materiality may be established by the testimony of the insurer's underwriter."); *Garde by Garde v. Country Life Ins. Co.*, 498 N.E.2d 302, 308 (Ill. App. 1986) (same); *Riversource Life Ins. Co. v. Amy Plumbing, Heating & Cooling, Inc.*, 2013 WL1110922, at *4-5 (N.D. Ill. Mar. 15, 2013) (same).

### B. 215 ILCS 5/155 Claim

Section 155 of the Illinois Insurance Code provides that when an insurance company's refusal to pay out on a policy "is vexatious and unreasonable," the court may allow the aggrieved party to recover attorney fees, other costs, and punitive damages. 215 ILCS 5/155. "Because this statute is 'penal in nature' its provisions must be strictly construed." *Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co.*, 200 F.3d 1102, 1110 (7th Cir. 2000) (quoting *Morris v. Auto-Owners Ins. Co.*, 606 N.E.2d 1299, 1305 (Ill. App. 1993)). "If there is a bona fide dispute regarding coverage—meaning a dispute that is real, genuine, and not feigned—statutory sanctions are inappropriate." *Med. Protective Co.*, 507 F.3d at 1087 (internal quotation marks and citations omitted); *see also State Farm Mut. Auto. Ins. Co. v. Smith*, 757 N.E.2d 881, 887 (Ill. 2001) (same); *Auto-Owners Ins. Co. v. Yocum*, 987 N.E.2d 494, 502 (Ill. App. 2013) (same).

15

Statutory penalties under § 155 "may not be awarded simply because an insurer takes an unsuccessful position in litigation, but only where the evidence shows that the insurer's behavior was willful and without reasonable cause." *Citizens First*, 200 F.3d at 1110.

Although Banner's argument that Paul's coverage was voided does not prevail at the summary judgment stage, it is beyond dispute that Banner's arguments "were presented with reasoned support." *Med. Protective Co.*, 507 F.3d at 1087 (internal quotation marks omitted); *see also Citizens First*, 200 F.3d at 1110 (same). The record shows that Banner's review of Paul's medical records raised reasonable (though perhaps incorrect) doubts as to whether Paul misrepresented his medical history on the Application. Even if Banner is ultimately unsuccessful on the merits, "this was a bona fide dispute regarding coverage, and that is all Illinois law requires to avoid the imposition of section 5/155 penalties." *Med. Protective Co.*, 507 F.3d at 1087 (holding that the "district court abused its discretion by awarding statutory penalties" even where the insurer lost on the merits); *see also Golden Rule*, 786 N.E.2d at 1018; *Smith v. Metro. Life Ins. Co.*, 550 F. Supp. 896, 898-99 (N.D. Ill. 1982) (granting summary judgment to the insurer where "[e]ven if plaintiff were ultimately to prevail on the merits of her claim it still could not be said that the insurance company took a vexatious and unreasonable position in rejecting the claim"). It follows that Banner is entitled to summary judgment on Siudut's § 155 claim.

## II.     Banner's Counterclaims

Banner's counterclaims are essentially the mirror image of Siudut's claim that Banner breached the policy. For the reasons set forth in Section I.A, *supra*, neither Banner nor Siudut is entitled to summary judgment on Banner's counterclaims due to genuine disputes regarding

16

whether Paul made a misrepresentation within the meaning of the governing Illinois standard when the Application's Question 4(a) and whether Paul's misrepresentation (if any) was material to Banner.

**Conclusion**

For the foregoing reasons, Siudut's motion for summary judgment is denied, and Banner's motion for summary judgment is granted in part (as to the § 155 claim) and otherwise is denied. Banner's motion to strike is denied, and Siudut's motions for leave to file an answer to Banner's counterclaims and for leave to file an amended Local Rule 56.1(b)(3)(B) response are granted.

August 30, 2013 _____
United States District Judge

17